[Civ. No. 351. Fourth Appellate District.—March 4, 1931.]

RODOLFO MONTES et al. v. C. L. PECK, Appellant.

334

Bauer, Wright & MacDonald, Newlin & Ashburn and Bauer, MacDonald, Schulthers & Pettit for Appellant.

Meserve, Mumper, Hughes & Robertson for Respondents.

BARNARD, P. J.—This is an action for damages for fraud and misrepresentation in the sale of certain real prop-

erty. The defendant, C. L. Peck, owned a building in Los Angeles, various portions of which had been leased to different persons for shops, stores, offices and a public garage. In October, 1926, Peck gave to a real estate agent named Canon, a written "exclusive option to buy or sell" the property, and furnished him with a list of the various leases, with the time they were to run and the amounts of rental provided for. Two such statements of leases and rentals, one of which was signed by Peck, were shown by Canon to the plaintiff, Rodolfo Montes, who agreed to purchase the property at a certain price. Peck and Canon then went into an escrow for the sale of the property and on December 24, 1926, Canon substituted Montes for himself, as a party to that escrow. In the original list referred to, it was stated that the lease on the public garage ran for ten years, the first five years at $550 a month and the second five years at $600 a month. How or when it got there does not appear, but there later appeared in this escrow a letter from Peck to Canon, dated December 24, 1926, showing that four or five of the tenants were paying a lesser amount of rent than the rentals listed, but still listing the garage as then paying $550 a month. Montes being unable to speak the English language very well, sent one of his employees to interview the various tenants, giving her a list of the rentals they were supposed to be paying, as shown by the statements furnished him. She found four or five cases in which the tenants were paying a smaller rental than that represented. However, the tenant in the garage assured her that he was making money; that the lease was exactly as represented; that he was paying $550 a month for the first five years and $600 for the remaining five years; that his rent was paid up to date; and that he was well satisfied with his lease. Upon receiving this information, Montes called Canon's attention to the discrepancies found and Canon referred him to Peck. On January 6, 1927, Montes and Peck, with their respective attorneys, met to discuss the matter. Montes asked for a reduction of $5,000 in the purchase price because of the discrepancy discovered in the amounts of rent paid. Peck expressed surprise that Canon had not advised Montes of these discrepancies in rent and took him to the escrow office and showed him his letter to Canon of December 24, 1926, wherein he set forth that he

was receiving a lesser amount of rent in the instances in which Montes had discovered a discrepancy, but in which he again asserted that he was receiving $550 per month for the garage. Peck then offered to reduce the purchase price in the amount of $2,000, which offer was accepted, and Montes agreed to go ahead with the deal. ·This agreement was arrived at on January 7, 1927, at which time Montes signed a paper prepared by Peck's attorney, reading as follows:

"Los Angeles, California, January ........, 1927

"Mr. C. L. Peck,

"Dear Sir:

"Please be referred to Escrow No. 959342 of Title Insurance and Trust Company, through which said escrow I expect to acquire title to certain property therein particularly described. Some question has heretofore arisen with reference to the income which the owner of said property is entitled to receive by reason of the existing leases. In consideration of the payment to me by you through said escrow of the sum of two thousand dollars ($2,000.00), I hereby agree that, upon the consummation of such sale through escrow, I will have no claim against you should it develop that the income from said property is less than the income as represented to me; provided, however, that this shall not release you from the effect of your representations in connection with the rental and lease deposit adjustment made through said escrow, and provided, further, that this release is upon the express condition that no new leases shall be made covering any portion of said property and no changes shall be made in any existing leases covering any portion of said property pending the close of said escrow.

"Yours truly,

"R. MONTES."

Later, the deal was closed, the consideration paid and a deed and assignments of the various leases were delivered to Montes. The evidence shows that for a long period of time prior to the closing of this deal, Peck had been receiving as rental for the garage mentioned, a sum very much less than $550 a month, and further that Peck had told the tenant of the garage that he desired to sell the property and had asked him to . tell anyone who inquired that he was

paying $550 a month. Even after Montes took possession of the property, Peck handed to the tenant of the garage $150 in currency each month for two or three months, in order that he might pay to Montes the rent called for by the lease. Subsequently, this tenant became insane and in a few weeks died. Then for the first time Montes discovered the misrepresentations which had been made in regard to the rentals from the garage, and this action followed. The complaint is in the usual form, and asks damages only for the fraud and misrepresentations as to the rental value of the garage. The court found in favor of the plaintiffs and gave judgment for the difference between the rental value of the garage as shown by the evidence, and the amount called for by that lease. From this judgment, the defendant Peck has appealed.

Appellant relies for a reversal of the judgment upon two propositions, to wit: 1. That the release agreement referred to was executed in consideration of $2,000 which was taken off of the purchase price of the property and which amount was therefore paid by the appellant, and that this completely bars this action until and unless the same should be rescinded by the respondents. 2. That this release agreement could not be rescinded by the respondents until, as required by section 1691 of the Civil Code, the $2,000 paid by the appellant was returned or offered to be returned by the respondents, and that no such restoration or offer to restore was made.

It is respondents' theory that the release agreement mentioned applied only to those leases in which discrepancies in the rentals had been discovered; that it was not the intention of the parties that this release agreement should cover all of the leases in question; and that, under the law, they were not required to restore or offer to restore anything to appellant, before maintaining this action.

We are unable to agree with the respondents that the release agreement mentioned was not intended by the parties to cover the matter of the garage lease. Just prior to its execution, the parties had been discussing the four or five leases in which discrepancies in the rent paid· had already been discovered. Mr. Irving Walker, who was then acting as attorney for respondents, testified that, in the presence of all of the parties, he asked Montes whether or

not there was any question with reference to any of the other leases. Mr. Montes replied that the others were all right, and the attorney then said that he would draw this release in general terms. At another time this attorney testified that he asked Montes whether or not there was any question in regard to the leases other than those which had been under discussion, and that Montes replied that there was not, that he or his representative had talked with all of the other tenants and the other tenants were paying the rentals called for by the leases, and there was no question as to those. Montes himself testified: "Mr. Walker said he could not advise me on the commercial part of it, that if I was sure that outside of those four leases, four or five, I cannot remember, the rest were all right, it was up to me to decide whether I should take less than the $5000 reduction."

Under such circumstances, we think that the intention of the parties at the time was, that the release agreement should apply to all of the leases in the building. ■ However, it appears that the appellant had made, and continued to make, gross misrepresentations as to the rental being received from the garage. While admitting the discrepancies in the other leases, that had already been discovered, he continued to represent that the garage lease, which is the most important one in the building, was then paying $550 a month. He disarmed suspicion by taking Montes to the title company to see written evidence of his fairness in the form of the letter calling attention to the lower rentals in the cases that had been discovered. But in this letter thus shown for the purpose of inducing Montes to sign the release and go on with the deal, he again listed the garage as then paying $550 a month. Even in the adjustment of the current month's rents, which was made between the parties based upon the date the respondents took possession, the appellant represented he had collected the full amount of rent for the garage for that month, and paid to respondents a sum which purported to offset the amount he had already collected for the remainder of that month, at $550 a month. He not only maintained this representation throughout, but for two or three months after the deal was closed, handed that particular tenant $150 in cash each month, to enable him to keep up the deception. Moreover,

he had rendered any investigation which the respondents undertook or which they might undertake, valueless, by inducing that tenant to misinform them as to the true state of facts. Under these circumstances, although the release agreement was intended by the parties to cover the garage lease, it was subject to be set aside for fraud and misrepresentation, under the rules of law applicable thereto. Upon sufficient evidence, the court found that this release agreement would not have been entered into by respondents, except for the fraud and misrepresentation of the appellant, and the judgment awarded was for damages found upon sufficient evidence to have been caused by this fraud. While certain other facts were found by the court which cannot be sustained, these are immaterial and harmless.

This appeal then turns upon the question whether or not it was necessary for the respondents, before maintaining this action, to return or to offer to return to appellant, $2,000 which appellant claims to have paid for the release in question, through a reduction in the purchase price of the property sold. Appellant argues that this release agreement, which is being attacked for fraud in its procurement, was voidable only, and therefore it must be rescinded and restoration made or offered, before a recovery could be had. He relies upon *Garcia* v. *California Truck Co.*, 183 Cal. 767 [192 Pac. 708], *O'Meara* v. *Haiden*, 204 Cal. 354 [60 A. L. R. 1381, 268 Pac. 334], and section 1691 of the Civil Code. It has been held in the cases referred to, and others, that where it is sought to set aside a release agreement where the parties understood what was involved, but where it is claimed that the making of the release contract was induced by fraud, the contract is voidable and not void; and that where the amount claimed by the plaintiff is an unliquidated amount, or, in other words, where the plaintiff is not in any event entitled to keep the amount paid, the consideration paid for the release must be restored or an offer to restore must be made. In all of the cases laying down this rule, to which our attention has been called, the action was one for damages for personal injuries, and the plaintiff sought to avoid a release agreement in order to go back to an original cause of action for tort, the action itself having no connection with the contract, except that the contract purported to bar such an action.

In the instant case, we have a different situation. The thing here purported to be released, while a form of tort, is one based upon fraud growing out of a prior executory contract; and the consideration given, which was a reduction in the purchase price of certain property, was really given to induce the other party to go on and complete a contract already agreed upon, but endangered by the discovery of a part of the fraud. The release agreement was contemporaneous with and an actual part of, a new agreement which merely continued the previous contract, in all respects the same, except for the one change in the amount of the purchase price. The original fraud, only a part of which had been discovered by the other party, was about to disrupt the deal, and the main, but undiscovered, part of this fraud was continued and recommitted for the purpose of inducing, and it actually did induce, the other party not only to sign the release agreement, but to continue with the entire contract for the purchase of the real property, although at a slightly different purchase price. We think such a release agreement may not be taken alone, and considered as a new contract, separate and distinct and independent from the entire agreement, and that the issue as to fraud in the execution thereof may not be here treated independently of the original controversy and original fraud, in the manner in which a release agreement, in such cases as those referred to, is treated independently of the original cause of action. On the other hand, we think this entire matter is one transaction, all contractual to begin with, but all tainted by the fraud which is here complained of, which continued throughout and touched all phases thereof. The entire deal is one contract for the sale of real property, and the release, with the fraud used to secure its execution, is but a part of the same fraud that induced the plaintiff to buy the property.

In cases like those above cited, if the plaintiff desires to go back to his original cause of action for tort, it is essential that he effect a rescission of the contract which purports to bar his cause of action. In other words, if he wants to sue on the original tort, he can neither stand on the release agreement nor act in violation thereof, but must move to set it aside. But in such a case as this, involving fraud in the sale of real property, it is well settled that a plaintiff may either rescind or stand on his contract and sue for dam-

ages. (*Paolini* v. *Sulprizio*, 201 Cal. 683 [258 Pac. 380].) The respondents here have elected to stand on their contract. Having chosen this remedy to which they are entitled, we think the purported release, which was a part of the entire contract, may not be segregated from the rest of the agreement, nor may the respondents be required to rescind as to that portion of the agreement, while permitted to sue for damages on the other part. The respondents have set up one cause of action based upon the main fraud in the entire deal, through which they were induced to purchase the real property. While a part of this fraud was discovered, and was partially rectified, this was done in such a manner as to inspire confidence in the respondents as to the good faith of the appellant, and to further throw them off their guard. The main and larger element of fraud which had existed from the beginning, in reference to the lease on the garage, was at the same time continued and used to induce the plaintiffs, both to sign this release agreement and to go on with the entire transaction. The same fraud was then continued for an additional two or three months, apparently to prevent discovery. Because a part of this contract was put in the form of a separate letter, and because it purports to be a release of certain things, does not make it a separate contract, disassociated from the entire agreement. We think this case falls within the general rules governing real estate contracts which have been entered into because of fraud practiced upon the purchaser, and that it does not fall within the rules governing such contracts as must be rescinded before the form of action brought can be maintained. The plaintiffs having elected not to rescind but to sue for damages, neither a restoration nor offer thereof was necessary.

The inapplicability of the rule contended for by appellant is further seen in the fact that the respondents have received nothing as a consideration for this purported release, except the property which was being purchased in the deal, and the appellant paid the respondents nothing for this release, except in the way of reducing the purchase price of that property. To require respondents to rescind one part of the contract, and as a part thereof, to restore or offer to restore $2,000 in cash which they never received, while under the established rule of law, they cannot be required to rescind

the whole contract, or restore the entire property, which they actually did receive, would be a most unusual situation. They received nothing except the property they were buying, and they had the right to retain that property and sue for such damages as were suffered through the fraud of the other party.

While the so-called release is not such a separate agreement as must be separately rescinded, as one of its effects, it did make a settlement of all claim for damages on account of the fraud already discovered. Its validity and effect for this purpose has not been, and is not here, attacked by either party thereto, this action involving only the fraud in respect to the garage lease which was then undiscovered. ▉ Incidentally, however, appellant argues that it would be inequitable to let this judgment stand, since respondents would then receive all they lost through the fraud, and $2,000 additional. No such situation exists. It appears that as to that part of the transaction, respondents received a reduction of $2,000 in the purchase price as an offset to a difference of $7,800 in rentals under specific leases, aside from the garage lease, between said leases as represented and the same leases as actually existing. While the point as to the sufficiency of the evidence to sustain the amount of the judgment has not been raised on this appeal, it is apparent from the record that the amount of the judgment plus the amount of the reduction in the purchase price of the property, is less than the amount shown by the evidence to have been lost by the respondents through the misrepresentations made.

The judgment is affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 27, 1931.